**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **MARK VERSTUYFT, ROBIN VERSTUYFT, THE BEYER LIVING TRUST, GORDON KUENEMANN and WENDY KUENEMANN** | § § § § § § | |
| **Plaintiffs,** | § § | |
| **vs.** | § § | **Case No. 5:24-cv-229** |
| **WELLS FARGO BANK, N.A. and WELLS FARGO NATIONAL BANK WEST** | § § § § | |
| **Defendants.** | § § | |

## ORIGINAL COMPLAINT

COMES NOW, Mark Verstuyft, Robin Verstuyft, The Beyer Living Trust, Gordon Kuenemann, and Wendy Kuenemann and file this their *Original Complaint* against Wells Fargo Bank, N.A., a national banking association, and Wells Fargo National Bank West, a foreign financial institution, and in support thereof would respectfully show unto the Court as follows:

**I.**
**INTRODUCTION**

1.      This is the devastating story of how the greed and avarice of the fourth largest financial institution in the United States and its affiliate permitted Christopher John Pettit, a disgraced and now convicted felon, to decimate the hopes, dreams, and generational wealth of a people in this community, including Robin and Mark Verstuyft, the Beyer Living Trust, and Gordon and Wendy Kuenemann each of whom were victimized because they trusted Christopher John Pettit ("Pettit"), their lawyer and 1031

Exchange Agent, and trusted the institutional integrity of Wells Fargo Bank, N.A. ("Wells Fargo") the nation's fourth largest financial institution.  The deceit and trickery of Pettit of the Plaintiffs in this case[1] under the guise and artifice of "advisor", "confidant", "counselor", "friend", and "fiduciary" was not just enabled by but succeeded only because of the blatant and intentional disregard by Wells Fargo of its own policies, federal banking regulations[2], and the facts as actually known by Wells Fargo for the duration of Pettit's scheme. In reversing its own initial judgment, Wells Fargo permitted Pettit, an unlicensed lawyer in the State of New Mexico, to open a New Mexico lawyer's trust account through which Pettit, with the assistance of Wells Fargo, stole millions of dollars from the Plaintiffs.  Both Wells Fargo and Pettit were enriched with the funds stolen from the Plaintiffs.   Pettit has been found liable for his misdeeds both in the United States Bankruptcy Court and has been sentenced to 50 years in prison in this Court for his behavior.  This lawsuit now seeks recovery from Wells Fargo for its participation in the theft of millions of dollars from the Plaintiffs.

2.     Pettit formed Christ Pettit & Associates, P.C. ("CP&A") in 1996 as an ordinary law firm through which the lawyers employed by CP&A practiced, including Pettit. Two decades later, beginning in 2017, Pettit would lay the groundwork with Wells Fargo for the manipulation of the CP&A NM IOLTA Account.[3]  That account would become a mechanism through which Pettit and Wells Fargo would steal from those entrusting their money to Pettit and Wells Fargo.  The scheme perpetrated by Pettit and Wells Fargo

---

[1]   Among the dozens of others having filed proofs of claim in Chris Pettit & Associates, P.C. case.
[2]   Specifically including the Know Your Customer rule.
[3]   Though Pettit opened in excess of 150 bank accounts across the country, this tale involves only those accounts located at Wells Fargo opened in 2017 but not activated until April 2021: Wells Fargo Account 9174 (the "NM IOLTA Account") and Wells Fargo Account 9720 (the "Texas IOLTA Account")(collectively, the "Wells Fargo Accounts").

resulted in financial gain for both of them and was accomplished through the use and ultimate depletion of the Wells Fargo Accounts over a mere thirteen (13) months, including approximately $3,000,000 of the Verstuyft's money, $1,200,000 of the Beyer Living Trust money, and $1,000,000 of the Kuenemann's money.  The actions of Pettit conducted through the NM IOLTA Account were made possible exclusively by Wells Fargo's willful decision to endorse and profit from the known abuse by Pettit of the NM IOLTA Account, wreaked financial havoc on the Verstuyfts, the Beyer Living Trust, and the Kuenemanns (collectively the "Pettit Victims") as 1031 Exchange[4] participants.  The losses sustained by the Pettit Victims were made possible because of the abject disregard by Wells Fargo of its own internal documentation, existing federal law including nearly every applicable AML/BSA[5] regulation (expressly including the Know Your Customer Rules), and New Mexico law regulating lawyer trust accounts. With the actual knowledge of the actions of Pettit ongoing in the NM IOLTA Account, Wells Fargo even allowed Pettit to open a second IOLTA account – Texas IOLTA Account – through which approximately one million dollars was lost.

3.      The records of Wells Fargo confirm that Pettit could not have carried out his scheme without the knowing assistance of Wells Fargo.  Wells Fargo logged the account activity in the CP&A and Pettit accounts and observed in real time that Pettit was misusing

---

[4]   Internal Revenue Code Section 1031 provides that the seller of real estate may avoid the recognition of gain or loss from the sale of real estate held for productive use in a trade or business or for investment if such real property is exchanged solely for real property of like kind which is to be held either for productive use in a trade or business or for investment within 180 days following the initial transfer of the property, subject to extension as provided in Section 1031.

[5]   AML/BSA laws refer to the collective federal anti-money laundering laws and regulations including, but not limited to, 12 C.F.R § 21.11, 12 C.F.R. § 21.21, 31 C.F.R. § 1010, 31 C.F.R. § 1020.

the NM IOLTA Account – a *prima facie* trust account – to deprive the Pettit Victims[6] of their money.  After sanctioning the illegal opening and use of the NM IOLTA Account by Pettit in 2017, and after the account laid dormant for nearly four years, starting in April 2021, Wells Fargo would go on to accept tens of millions of dollars into the NM IOLTA account, including multiple cash deposits, and then execute transactions through which the funds were commingled and then dissipated for the benefit of Wells Fargo and Pettit. The outgoing activity took the form of over a million dollars in cash withdrawals, multiple transfers to Pettit's personal accounts maintained at Wells Fargo and other financial institutions, payments for personal obligations of Pettit, including payments *to Wells Fargo* on Pettit's personal mortgage[7], multiple international transfers to Banco Santander[8], and even the direct attachment of a PayPal account to the NM IOLTA Account which was regularly used to purchase video games.

4.     Wells Fargo, as noted, initially declined to open the NM IOLTA account, in accordance with sound banking practices, but succumbed to its own avarice and greed at the insistence of multiple "Premier Private Bankers" to placate the whims of Pettit which they identified as a "very High Net Worth client who [was] being courted by The Private Bank"[9] and who insisted that the IOLTA account be opened as a NM IOLTA[10] and *not* a Texas IOLTA account.  Rather than following the mandates of the Know Your Customer

---

6    Bridget Cerny, as the designated representative of Wells Fargo, acknowledged the "trust" nature of the NM IOLTA Account.

7    Though originated by Wells Fargo, as of the Petition Date, the Argyle Mortgage appears to have been assigned to an affiliate of Wells Fargo – Wells Fargo National Bank West.

8    At all times during the activity in the NM IOLTA Account, Banco Santander has been on the watchlist worldwide for their failure to adequately maintain anti-money laundering controls.

9    *See* **Exhibit 1**: WF-00004867

10   Contrary to the Declaration of Wendy Hernandez, Executive Business Consultant for Wells Fargo, filed as Doc# 14-1 in the Adversary, the 9174 Account was opened as an IOLTA Account.  *See* **Exhibit 9**

Rule or adhering to the requirements of the State Bar of New Mexico regarding the opening and maintenance of an "Interest On Lawyers Trust Account" in the State of New Mexico, Wells Fargo knowingly and consciously disregarded the fact that *Pettit, the sole signatory* on the NM IOLTA account, *was not licensed to practice law in the State of New Mexico*, and that CP&A was not authorized to conduct business in the State of New Mexico until after the intervention of Wells Fargo[11] In the face of each of these known facts, Wells Fargo disregarded the "Know Your Customer Rule" and opened the NM IOLTA Account to pacify their "High Net Worth" customer.

5.     Starting in April 2021, in keeping with the perceptions of the "High Net Worth" status of Pettit, Wells Fargo continued to disregard hundreds, if not thousands, of transactions identified by federal regulators as suspicious activity in bank accounts (the "Red Flags").  Despite holding a contractual and statutory ability to close the NM IOLTA Account *at any time*, Wells Fargo maintained the NM IOLTA Account and carried out Pettit's instructions accepting specious deposits, permitting nearly weekly *cash* withdrawals well in excess of the threshold reporting standards for AML/BSA[12] compliance, and executing transfers to hide the trust funds in the NM IOLTA account from the reach of the owners of those funds, including the Beyer Living Trust, the Kuenemanns, and the Verstuyfts, all while lending Pettit the credibility of the nation's fourth largest banking institution.

6.     The actions of Wells Fargo in connection with the NM IOLTA Account viewed in the best light constitutes grossly negligent willful blindness which the Courts

---

[11]   *Id.*
[12]   Anti Money Laundering and Bank Secrecy Act 12 C.F.R. § 21.21.

have long held does not insulate actors like Wells Fargo from liability; but in a true light exhibits the knowing and intentional actions of Wells Fargo and those employees that could stand to benefit from those actions consistent with the culture of corporate greed and intentional disregard of banking regulations which resulted in the issuance of the Asset Cap Order by the Office of the Comptroller of the Currency and the billions of dollars in fines already paid by Wells Fargo for its chronic institutional disregard for the law and the wellbeing of its customers and the ordinary citizens who look to banks like Wells Fargo as institutions of integrity.  As noted by Charles Scharf, CEO, Wells Fargo & Co. in his September 2022 address to the Senate Banking Committee: "[t]he company has been too slow in building and implementing appropriate risk and control frameworks …and until our broad book of risk, control and regulatory work is complete, we remain at risk for setbacks."[13]

## II.
## PARTIES

### A. Plaintiffs

7.    Plaintiff Mark Verstuyft is a citizen and resident of the State of Texas.

8.    Plaintiff Robin Verstuyft is a citizen and resident of the State of Texas.

9.    Plaintiff The Beyer Living Trust is a Revocable Trust acting through its Co-Trustees, Earl Beyer and Kenneth Beyer, who are residents and citizens of Texas. Accordingly, the Beyer Living Trust is a citizen, and resident of the State of Texas.

10.    Plaintiff Gordon Kuenemann is a citizen and resident of the State of Texas.

11.    Plaintiff Wendy Kuenemann is a citizen and resident of the State of Texas.

---

[13]    *See* **Exhibit 29**: September 22, 2022 Testimony of Charles W. Scharf, Chief Executive Officer and President, Wells Fargo & Company, page 4.

### B.  Defendants

12.    Defendant Wells Fargo Bank, N.A. is a national banking association formed in Delaware, with its principal place of business at 420 Montgomery Street, San Francisco, California.  Wells Fargo Bank, N.A. may be served with process through its registered agent for service Corporation Service Company d/b/a CSC – Lawyers Incorporating Services Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. McGuireWoods LLP, as counsel for Wells Fargo, has agreed to accept service on behalf of Wells Fargo and answer pursuant to the terms of the Stipulation entered in Adversary No. 23-05039 pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

13.    Defendant Wells Fargo National Bank West is a foreign financial institution formed under the laws of the State of Delaware, with its principal place of business at 4455 Spring Mountain Road, Las Vegas, Nevada, 89102-8719. Wells Fargo Bank West may be served with process through its registered agent for service Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218. McGuireWoods LLP, as counsel for Wells Fargo, has agreed to accept service on behalf of Wells Fargo and answer pursuant to the terms of the Stipulation entered in Adversary No. 23-05039 pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

### III.
### JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332. The parties have consented to venue pursuant to the Stipulation entered in Adversary

No. 23-05039 pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division.

## IV.
## FACTUAL ALLEGATIONS

### A. Pettit and CP&A

15.     Pettit graduated from law school and was licensed to practice law in the State of Texas in November 1991.  According to Pettit and as substantiated by the records of the State Bar of New Mexico, Pettit was never licensed to practice law in the State of New Mexico. Consistent with the testimony of Pettit and based on a review of state bar licensing across the 50 states, Pettit was not licensed in any state other than the State of Texas.  Pettit began practicing law in San Antonio, Texas and focused his practice in the areas of wills & estates, probate, and personal injury.   Pettit formed CP&A in 1996. Though Pettit was the sole shareholder of CP&A, Pettit was not the only lawyer employed by CP&A.  CP&A employed at least 20 people including lawyers, paraprofessionals, and office personnel in furtherance of the business of CP&A. CP&A, at all times during the period in question, operated as a separate legal entity, duly formed and authorized to transact business in the State of Texas and in the State of New Mexico effective August 2017. Pettit developed a niche market through the hosting of estate planning seminars primarily in Bexar and the surrounding counties focusing his efforts on rural agricultural communities and the burgeoning wealth attendant to the Eagle Ford Shale region of south Texas. As Pettit's reputation grew, the services that were offered through CP&A expanded from traditional legal services to include investing, tax preparation, and 1031 Exchange Agent services.

16.     On information and belief, Pettit began his scheme to avail himself of the assets and opportunities of CP&A and the clients of CP&A around 2007, a decade after the formation of CP&A.  Pettit used various community banks in the greater San Antonio

metropolitan area to relieve CP&A and the Pettit Victims of their hard-earned resources prior to associating with Wells Fargo starting in early 2017.  On information and belief Pettit opened accounts for CP&A with Broadway Bank, Frost Bank, Bank of San Antonio, Bank of America, TexStar National Bank and Winter Park National Bank to further his scheme to defraud the clients and 1031 Exchange counterparties of CP&A. Pettit used the CP&A funds on deposit in many of the aforementioned financial institutions to pay his personal debts to Wells Fargo, including the Argyle Mortgage, *infra*., and Wells Fargo issued credit cards on which Pettit was personally liable.  On information and belief, Wells Fargo made no attempt, either prior to the opening of the NM IOLTA Account in 2017 or once Pettit started using the account in April 2021, to ascertain any information about Pettit's prior banking relationships.

## B. The 1031 Exchange Angle

17.    Starting in the mid-2000s Pettit identified a veritable bird's nest on the ground in the form of 1031 Exchanges.  Pettit, through the use of CP&A and the client base of CP&A, held CP&A out as a "qualified intermediary" for "like kind property" exchanges pursuant to Section 1031 of the Internal Revenue Code (hereinafter a "1031 Exchange").  1031 Exchanges have limitations which include strict timing requirements (45 to 180 days),[14] property characteristic limitations (i.e. investment property for investment property),[15] and the mandate that they be undertaken by a qualified exchange agent (a disinterested person i.e. not your lawyer, accountant, investment banker, broker, or real estate agent).[16]

---

[14]   IRC §1031(a)(3)
[15]   IRC §1031(a)(1)
[16]   Treas. Reg. §1.1031(k)-1(g)(4)

18.     Over the years dozens, if not hundreds, of 1031 Exchanges were undertaken by Pettit through the use of CP&A.   Pettit utilized local banks as the depositories for his 1031 Exchange transactions until April of 2021 when he began utilizing Wells Fargo as the primary depository bank for these transactions.

## C. <u>Wells Fargo Enabled Pettit</u>

19.     In or around 2017 Pettit made the acquaintance of Maria Breen, then a Senior Private Banker with Wells Fargo.   Ms. Breen would become the conduit between Pettit and Wells Fargo, assisting Pettit in the opening of the various CP&A and personal accounts with Wells Fargo.   It was through the direct intervention of Ms. Breen along with "Premier Banker" Mark Pope, and Eliza Gomez with the NBBC[17] that Pettit was allowed, in direct violation of New Mexico State law, in contravention of the warnings from the New Mexico Secretary of State[18], and in violation of the "*Know Your Customer Rules*" to open the NM IOLTA Account (9174).[19] Ms. Breen also facilitated the opening of the original Texas IOLTA Account (5032) and Pettit's personal account (4978) into which Pettit made the first transfer of CP&A money which was used to pay the Argyle Mortgage, *infra*..

20.     Though the NM IOLTA Account would lie dormant between September 2017 and April 2021 with only minimal placeholder deposits[20], Pettit immediately began to establish his bona fides with Wells Fargo by transferring $920,000 from a CP&A account maintained at Frost Bank and styled "Estate Management Account" into *Pettit's* <u>*personal*</u> Wells Fargo account ending in 4978 (the "<u>Pettit Personal Account</u>").

---

[17]   National Business Banking Center
[18]   *See* **Exhibit 2**: WF-00004952
[19]   *See* **Exhibit 1**: WF-00004867**, Exhibit 3**: WF-00004764–4770
[20]   An initial deposit of $1,000, a $1,000 additional deposit in April of 2020, and a $100 deposit in February of 2021 serving as placeholders for the account

21.     Almost immediately after opening the Pettit Personal Account, Pettit withdrew $827,298.82[21] from that account as the downpayment on the purchase of real property – 555 Argyle – that would be financed by Wells Fargo (the "Argyle Mortgage") and apparently serve as the motivation, at least in part, for Wells Fargo to disregard the original efforts of the National Business Banking Center ("NBBC") to comply with the policies of Wells Fargo and New Mexico State law related to the opening of IOLTA accounts.[22]   The nearly $93,000 left in the Pettit Personal Account would be used to service the Argyle Mortgage through internal transfers managed and documented by Wells Fargo.  As time passed, Pettit would continue paying the Argyle Mortgage through internal transfers often facilitated by Wells Fargo employees from funds on deposit in the NM IOLTA Account.

22.     As discussed more thoroughly below, between July 2017 and August 2022, Pettit would use nearly a million dollars of CP&A money to pay the Argyle Mortgage. Between June 1, 2018 and August 5, 2022 Pettit paid Wells Fargo $798,148.39 on the Argyle Mortgage using money from CP&A and from the NM IOLTA Account (the "Argyle Payments"). Specifically, Wells Fargo or its affiliate, Wells Fargo National Bank West ("WFNBW") received payments from monies owned by the Verstuyfts and monies owned by the Beyer Living Trust for the Argyle Mortgage.

23.     Starting in 2021 the payment of the Argyle Mortgage to Wells Fargo would be made at least 29 times with funds misappropriated from the NM IOLTA account owned

---

[21]   In a preview of things to come, though the Pettit Personal Account statement for July 2017 reflects that the $827,283.82 was a "withdrawal made in a Branch/Store" Wells Fargo has not produced a corresponding Currency Transaction Report or cashier's check for the transaction. Though it does appear that the funds were used to pay the cash at closing on the purchase by Pettit of the 555 Argyle property.

[22]   *See* **Exhibit 1**: WF-00004867, **Exhibit 3**: WF-00004764–4770

by CP&A including 2 payments from the Verstuyfts' funds and one payment from the Beyer Living Trust's funds.   On one or more occasions Wells Fargo personnel facilitated the improper use of funds from the NM IOLTA Account.[23] The payment of the Argyle Mortgage from the funds on deposit in the NM IOLTA Account was a direct financial benefit to Wells Fargo and/or its affiliate WFNDW which caused actual damage to the Verstuyfts and the Beyer Living Trust in an amount not less than the amount of the payments.  On information and belief, at the time that the Argyle Payments were made, the payments were received by and directly benefited Wells Fargo and/or WFNBW.

   **i.   Wells Fargo participated and profited from Pettit fraud and breach of fiduciary duty to the Pettit Victims.**

   24.    On information and belief, Wells Fargo was a willing participant in the scheme of Pettit to defraud the Pettit Victims because Pettit showed great potential for running millions, if not billions of dollars through the accounts he controlled at Wells Fargo. By way of example, in February 2020, Pettit and CP&A were retained by a personal protective equipment company to act as a paymaster or escrow agent for the enterprise. Wells Fargo, to the attention of Maria Breen, was listed as the escrow bank.   The expectation relayed to Maria Breen and Wells Fargo was that the paymaster relationship would generate deposits in the range of $20 million to $2 billion annually. Though never quite reaching the values anticipated, deposits in excess of $3,000,000 were actually received and run through a CP&A account.  On information and belief, the relationship with Pettit and CP&A was fostered by one or more Wells Fargo employees, including Maria Breen, because the Wells Fargo culture financially rewarded those employees

---

[23]   *See* **Exhibit 5**: Table of Argyle Mortgage Payments

based on a number of metrics including the number of accounts opened, the amount of the daily balances in those accounts, and the amount of the deposits that were made to those accounts.  This activity is frighteningly reminiscent of the fictitious account and credit card scandal for which Wells Fargo was fined in excess of three billion dollars in 2020.[24]  With a view towards this opportunity, Wells Fargo pulled out all of the stops to get business from Pettit and CP&A contacting Pettit almost daily and offering him tickets to events, fancy dinners, and other perks.  Wells Fargo through Maria Breen encouraged Pettit to direct the clients of CP&A to bank with and to invest with Wells Fargo.

25.     On information and belief, as a result of the value potential afforded to Wells Fargo through the account activity of Pettit and CP&A, Wells Fargo either actively enabled Pettit to breach his fiduciary duties and duties of care to the Pettit Victims through the misappropriation of their assets or intentionally looked the other way[25] allowing the fraud and breach of fiduciary duty to occur with apparent impunity through the use of the NM IOLTA Account.

**ii.     Wells Fargo's requirement to know their customers.**

26.     As referenced above, starting in mid-2017, Pettit needed to hedge against being ejected from the community banks that he had been operating through for the last decade. In the summer of 2017 Pettit went to a local branch of Wells Fargo and opened the Pettit Personal Account (4978) and what he thought would be a New Mexico IOLTA account but ended up being the original Texas IOLTA Account (5032).  The NM IOLTA Account (9174) would not actually be opened until September 2021.  The account

---

[24]   *See* **Exhibit 6**: 2020 Deferred Prosecution Agreement
[25]   The "willful blindness" of Wells Fargo which constitutes a blatant disregard, at a minimum, of the Know Your Customer Rules

opening dates were as follows:

    a.  July 3, 2017 — Pettit Personal Account (4978)[26]

    b.  August 22, 2017 — original Texas IOLTA Account (5032)[27]

    c.  September 21, 2017 — NM IOLTA Account (9174)[28]

Pettit was the _sole signatory_ on each of these accounts.

27.     As noted above, on the day after the Pettit Personal Account was opened, Pettit closed on the purchase of 555 Argyle, San Antonio, Texas with Wells Fargo providing the mortgage for that property.  From the first mortgage payment in August of 2017 through end of the Pettit charade, Wells Fargo took or received payment for the personal obligation of Pettit to Wells Fargo out of the Pettit Personal Account and the NM IOLTA Account directly and indirectly.[29] As discussed above, Wells Fargo was paid on the Argyle Mortgage at least 29 times out of the NM IOLTA Account.

28.     It is a fundamental tenet of banking that banks are required to know their customers and understand their customers' banking behavior. _See_ 31 C.F.R. §§ 1020.220(a)(1) and (2).  This provision is commonly referred to as the "Know Your Customer Rule" (the "KYC Rule").  As a result of the KYC Rule, which is applicable to federally chartered banks, Wells Fargo is required to collect information about the holder of each account, including confirmation of the authority of the person opening the account to do so. As part of that process, when an account is opened with Wells Fargo its employees are required to obtain information concerning the individuals who control the

---

[26]  _See_ **Exhibit 7**: Account 4978 Opening Agreement and Signature Cards
[27]  _See_ **Exhibit 8**: Account 5032 Opening Agreement and Signature Cards
[28]  _See_ **Exhibit 9**: Account 9174 Opening Agreement and Signature Cards
[29]  _See_ **Exhibit 5**: Table of Argyle Mortgage Payments – NM IOLTA only; and **Exhibit 36** – All Argyle Mortgage Payments and other §548 transfers.

account *along with such other information as may be required to confirm that the signatories to the account are, in fact, authorized to act in the manner proposed through the account*. It is undisputed and undisputable that only a lawyer licensed to practice law in the State of New Mexico is eligible or "authorized" to open an Interest On Lawyers' Trust Account ("IOLTA") in the State of New Mexico. Wells Fargo maintains publicly[30] that it and each of its employees must comply with applicable all *rules*, regulations, and Company policies.  At a minimum from the period of at least September 2017 through May 2022, Wells Fargo adopted the "*Pettit Exception*" to their compliance culture.

29.     Wells Fargo knew from the first moments of the relationship with Pettit that Pettit was suspect and *should* have identified Pettit and the NM IOLTA Account for monitoring, but they did not.  When Pettit approached Wells Fargo to open the various accounts in the summer of 2017, Wells Fargo commenced an investigation into whether Pettit was actually eligible or authorized to open the NM IOLTA Account.[31] Notwithstanding the express requirements of New Mexico law that *only* New Mexico licensed lawyers may be signatories on a New Mexico IOLTA account[32], Wells Fargo elected to circumvent that requirement through the acceptance of the Certificate of Authority for CP&A by the Secretary of State for the State of New Mexico.[33] Wells Fargo

---

[30]   *See* **Exhibit 10**: Testimony of Wells Fargo representative Karen Nelson (Page 130, Line 5 through Page 133, Line 18); **Exhibit 11**: Testimony of Wells Fargo representative Bridget Cerny (Page 28, Line 15 through Page 29, Line 2).  See also **Exhibit 12**: Wells Fargo 2022 10-K.

[31]   Wells Fargo opened Case # 129755342 prior to the date on which the NM IOLTA Account was opened. Pursuant to the HOGAN database entries "Deb with the Resolution Team has worked Case # 129755342 to conclusion.  Elisa with NBBC will open a New Mexico IOLTA.  The TX IOLTA will be closed and the funds transferred to the new account." *See* **Exhibit 4**: WF-00004764–4770, and **Exhibit 14**: WF-00004779–4784, and **Exhibit 15**: WF-00004818.

[32]   *See* **Exhibits 16, 17, 18,** and **19**: NM Rule 16-115, 17-204, 24-109 and New Mexico Trust Account Manual.

[33]   *See* **Exhibit 1**: WF-00004867, and **Exhibit 3**: WF-00004952

---

flagrantly and intentionally disregarded the threshold requirement of New Mexico law that each signatory to an IOLTA account in that state be licensed by the State of New Mexico to practice law. Instead, Wells Fargo opted to permit Pettit to use a _business license_ as a substitute for a _law license_.  In this effort, Wells Fargo openly disregarded the admonition in the New Mexico Secretary of State's transmittal to CP&A which was provided to Wells Fargo and which stated "[_p]lease be advised that although the Certificate of Authority has been approved, you _must_ comply with all other federal or state laws applicable to your professional corporation_" (emphasis added).[34] Wells Fargo welcomed Pettit with open arms for the sake of facilitating the illegal activities of its new "High Net Worth" client.

30.    According to the testimony of Bridget Cerny, the second Wells Fargo representative presented pursuant to the examination of Wells Fargo order by the Bankruptcy Court, Wells Fargo claimed to have _no responsibility_ to determine whether Pettit actually held a New Mexico law license under either the KYC Rule[35] or the New Mexico rules and regulations regarding the opening, operation, and maintenance of IOLTA accounts.[36]

31.    Wells Fargo is also required to develop, administer, and maintain a program to ensure compliance with federal Anti-Money-Laundering ("AML") laws.[37]  The program is to be approved by the bank's board of directors and: (1) provide a system of internal controls to ensure compliance at all times, (2) provide for independent testing of the bank's ongoing compliance, (3) designate an individual to coordinate and monitor

---

[34]  _Id._
[35]  See 31 C.F.R. 1020.220
[36]  _See_ **Exhibit 30**: Testimony of Wells Fargo Representative Bridget Cerny (Page 69, Lines 13-25)
[37]  _See_, 12 C.F.R. § 21.21.

compliance, and (4) provide training for appropriate personnel.   In the Rule 2004 Examination of Karen Nelson conducted in the Pettit bankruptcy proceeding she represented that Wells Fargo has procedures in place that comply *in all respects with all* AML laws, and Wells Fargo *complies with all applicable laws*.[38] In the case of Pettit, Wells Fargo elected not to comply.  Wells Fargo also continues to represent in its public filings with the Securities and Exchange Commission that compliance with "all applicable laws, regulations, and Company policies" is the obligation of each and every employee of Wells Fargo.[39]

32.     Notwithstanding the suspect nature of the relationship with Pettit, the lawyers for Wells Fargo represented to the Bankruptcy Court in connection with the investigation of these events by the Verstuyfts and the Beyer Living Trust the that from the inception of the NM IOLTA Account, "there were no Investigations regarding the opening and/or activity in the . . . CP&A Accounts" other than Case #19755342 and six (6) suspicious check investigations.[40]   As is evidenced by the notes from Case #19755342, Wells Fargo's employees abandoned the compliance promises made by Wells Fargo to the public in favor of the promise of future profitability through a relationship with Pettit.

### iii. Wells Fargo ignored both the *Know Your Customer Rule* and AML laws when it came to Pettit.

33.     Wells Fargo maintains a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer

---

[38]   *See*, **Exhibit 10**: Testimony of Wells Fargo representative Karen Nelson (Page 130, Line 5 through Page 133, Line 18)
[39]   *See* **Exhibit 20**: Exhibit 10 of Wells Fargo's 2022 10-K, page 28.
[40]   See **Exhibit 13**: ECF 885, page 4, paragraphs d and e.

is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer. The programs utilized by Wells Fargo include DIPR, EWS, Client Relationship Manager, Hogan, TellerVision, Actimize, StoreVision, and Universal Workstation.[41]  The customer due diligence programs allow Wells Fargo to maintain awareness of the financial activity of its customers and to predict the type and frequency of transactions in which its customers are likely to engage. Actimize is an artificial intelligence and data analytics software platform.  Actimize markets its product as "entity-centric," and capable of revealing hidden connections and relationships between transacting parties across multiple accounts and transactions.  Actimize automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance Red Flags, and automatically detects and analyzes abnormal or risky behavior.  When the software identifies activity warranting further review or escalation, it alerts bank personnel to investigate.

34.     Wells Fargo represents that it designates a senior bank official to be the compliance officer responsible for coordinating and monitoring compliance with federal AML laws. The compliance officer, in turn, designates an individual at each office or branch to monitor the bank's day-to-day compliance, including the branches used by Pettit and CP&A to operate the NM IOLTA Account.  Of particular note is that all of the banking transactions by Pettit through the NM IOLTA Account took place in San Antonio, Texas or Orlando, Florida.[42]

---

[41]  *Id.* at paragraph a.
[42]  On at least 3 occasions, Pettit withdrew cash or transferred funds from the NM IOLTA Account while in Orlando, Florida aided, on information and belief, by Wells Fargo employees.

35.     The federal government established the Federal Financial Institutions Examination Council ("FFIEC") in 1979. Wells Fargo receives guidance from the FFIEC, which is tasked with ensuring consistency in AML compliance efforts across the banking sector. FFIEC publications describe certain "red flags" that indicate money laundering schemes and other misconduct mandating further inquiry. These are the very schemes for which Pettit is now serving a 50 year sentence in federal prison.   Examples of the "red flags"  relevant to the banking activities of Pettit at Wells Fargo include:

    a.  "Many funds transfers are sent in large, round dollar, hundred-dollar, or thousand-dollar amounts."

    b.  "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

    c.  **"**Unusual use of trust funds in business transactions or other financial activity**."**

    d.  "A large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

    e.  "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

    f.  "Funds transfers contain limited content and lack related party information."

    g.  **"**Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals.**"**

    h.  "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

    i.  "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

     j.    **"**Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose**."**

     k.    "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

     l.    **"**Funds are sent or received via international transfers from or to higher-risk locations**."**[43]

36.    Consistent with FFIEC guidance, Wells Fargo represents that it maintains a system of controls sufficient to identify patterns of account activity, *particularly activity between Wells Fargo accounts*, which would necessarily include the transactions between the NM IOLTA Account and Pettit's Personal Account.  The substantive nature of the transactions, the relationships between the transacting parties, and the parties' identities, can be examined through this system. This process would have necessarily identified the multitude of "red flag" transactions undertaken by Pettit, including those "red flag" transactions with which Wells Fargo personnel actually assisted Pettit.[44]  Wells Fargo represents that it has procedures in place to analyze suspicious activity against the backdrop of industry norms and each customer's background. Such procedures would necessarily have identified the numerous cash withdrawals, Argyle Mortgage Payments, PayPal transactions, and Banco Santander transfers made out of the NM IOLTA Account. Pursuant to the FFIEC guidelines, Wells Fargo is expected to use external sources of information like the internet, commercial database searches, and direct inquiries to determine the identity of originators and beneficiaries, and/or the nature of suspicious account transactions.

---

[43]  *See* **Exhibit 21** FFIEC Red Flags at pp. 1-9.
[44]  *See* **Exhibit 31**: Table of Wells Fargo Assisted Transactions

No. 24-229
*Verstuyft, et al v. Wells Fargo Bank, N.A.*
Original Complaint                                    Page **21** of 59

38.     Wells Fargo collects and maintains information about its customers and their banking behavior in order to, among other things, detect and prevent money laundering and fraud and to protect itself from third party liability and reputational injury. Unquestionably in this category of monitoring would be the cash deposits and withdrawals into the NM IOLTA Account as well as the international wire transfers such as the Banco Santander transfers.  Wells Fargo maintains procedures to know the identity of each customer (as required by 31 C.F.R. § 1020.220(a)(1)), and to collect information about the holder of each account (as required by 31 C.F.R. § 1020.220(a)(2)). When an entity rather than an individual opens an account, the bank obtains information about the individual who will control the account (as 31 C.F.R. § 1020.220(a)(2)(ii)(C)). The information that Wells Fargo _should_ collect about new business account clients includes the purpose and nature of the business, anticipated activity in the account (e.g., volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer. In the case of trust accounts, Wells Fargo _should_ ascertain the _actual authority_ of the person to act. It is difficult to imagine a circumstance more clearly suited for confirmation under Title 31 than the necessity for determination that a signatory to an IOLTA account is, in fact, a lawyer licensed to practice law in the jurisdiction in which the IOLTA account is to be opened.

39.     Wells Fargo also creates an initial client profile using the information collected, along with the other resources available to it like internet search engines and public and commercial record databases and assigns a compliance-related risk rating. Neither the profile, nor the risk ratings are fixed.  In other words, and pursuant to banking

regulations, Wells Fargo is required to update this information based upon the *actual activity* in the account and updates or changes in the customer's profile. When Wells Fargo becomes aware that information about a customer has materially changed, its internal controls *require* updating of that information and, where appropriate, reassessing the customer's risk profile or rating. One of the ways in which the bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account—for instance, when there are significant, unexplained changes in or events occurring in the account.  A clear example of this would be the recurring cash withdrawals from the NM IOLTA Account and the attachment of a PayPal account to the NM IOLTA Account which reflected numerous video game purchases. The bank may also become aware through direct notification events from governmental authorities – like contact by the Department of Justice or the New Mexico Supreme Court.  When presented with *actual confirmation* from the New Mexico Supreme Court that Pettit *was not licensed* to practice law in the State of New Mexico, Wells Fargo logged the information and *elected to ignore* this notification[45] because it was more economically advantageous to Wells Fargo to do so.

40.    Under applicable federal regulations, Wells Fargo is also required to maintain internal controls to ensure ongoing compliance with federal AML law. These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering. Through these programs, Wells Fargo obtains information that gives it an understanding of the unique financial activity of its customers.

---

[45]   *See* **Exhibit 22**

Likewise, Wells Fargo can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. This knowledge is used to identify unusual and suspicious transactions. As confirmed by the stipulation of Wells Fargo, other than investigation of a few transactions in April and May of 2021, ***Wells Fargo undertook no Investigations regarding the activity in the CP&A Accounts, including the NM IOLTA Account***.[46] If such is actually true, Wells Fargo cannot be rewarded or even given a pass for its *willful blindness* to the thousands of "red flags" under the auspices of its theory that it simply had no duty to do anything once the NM IOLTA Account was opened.

41.     Wells Fargo bankers processing outgoing wire transfers are trained to ask the customer questions designed to detect money-laundering, including the purpose of the transaction and the nature of the relationship between the parties. Wires between $25,000 and $100,000 automatically prompt personnel to use a checklist to evaluate the transaction. A customer service manager who approves outgoing wires often conducts a secondary review, confirming that the checklist questions were adequately addressed. Wire transactions above $100,000 require additional approval of a regional Wells Fargo employee, and transactions over $500,000 also require branch manager authorization. Similarly, before the bank credits a large check, multiple bankers review the check image for potential indicators of fraud or other misconduct, including unusual notations and disparities between the location of the payor, the payee (i.e., the customer), and the depositor. When these efforts detect unusual activity, employees are supposed to examine the account more fully, including by reviewing the account's transaction history

---

[46]    See **Exhibit 13**: ECF 885, page 4, paragraphs d and e.

and consulting with employees who opened or who have worked on the account. Various branch-level personnel also regularly review Balance Fluctuation Reports. These reports highlight substantial balance fluctuations and list the account activity in the accounts covered by the reports.

42.     The activities in the NM IOLTA account starting in April 2021 began to reflect many common—and actually glaring—signs of money laundering and fraud. As noted, in early May of 2021 Wells Fargo was warned by the Supreme Court of the State of New Mexico that Pettit *was not* licensed to practice law in New Mexico when Wells Fargo received the following letter from that committee.[47]

May 12, 2021

Wells Fargo Bank, NA
IOLTA/RETA Reporting
P.O. Box 3908
Portland, OR  97208

To Whom it May Concern:

This is to acknowledge the receipt of the overdraft information against Chris Pettit & Associates. Please be advised that we are unable to process this information regarding Mr. Pettit, as he is not an attorney registered in New Mexico and is not practicing law in the state of New Mexico.

Very truly yours,

Anne L. Taylor<br>Chief Disciplinary Counsel

Even with *direct notification* from the Supreme Court of the State of New Mexico, Wells

---

[47]  *See* **Exhibit 22**: Letter from the Supreme Court of New Mexico containing embedded internal comment by Wells Fargo

Fargo chose not to terminate or even investigate its relationship with Pettit and instead continued providing banking services to Pettit throughout the life of the scheme. Curiously, based upon the representations of counsel for Wells Fargo, there were *only* seven (7) events or activities in the NM IOLTA Account that were *ever* investigated by Wells Fargo:

      a. The ability of Pettit, a non-lawyer in New Mexico, to be the sole signatory on the NM IOLTA Account investigated in August of 2017 (which Wells Fargo wrongfully concluded he could)[48]

      b. Suspicious Check Alert for Check No. 1270 payable to Chris Pettit investigated on April 16, 2021[49]

      c. Suspicious Check Alert for Check No. 1258 payable to Chris Pettit investigated on April 16, 2021 [50]

      d. Suspicious Check Alert for Check No. 1259 payable to Chris Pettit investigated on April 16, 2021[51]

      e. Risky ACH alert on November 5, 2021[52]

      f. Risky ACH alert on November 13, 2021[53]

    43.    No other activity or transaction was investigated including the cash deposits to or cash withdrawals from the NM IOLTA Account[54]. Though within the lexicon of Wells Fargo and required as a part of their account monitoring discussed above but excluded from the protective veil of the S.A.R. privilege, Wells Fargo did not produce a single

---

[48] *See* **Exhibit 14**: WF-00004779–4784
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] Currency Transaction Reports ("CTR's") were completed, though improperly, for most of the cash withdrawals made out of the New Mexico IOLTA Account.  Other than the completion of CTR's there is no indication that any investigation was conducted including a determination of why cash withdrawals were being undertaken when the New Mexico Rules (17-204.A.(6)) *expressly prohibit* cash withdrawals from New Mexico IOLTA Accounts.

No. 24-229
*Verstuyft, et al v. Wells Fargo Bank, N.A.*
Original Complaint                                             Page **26** of 59

Unusual Activity Report.  In the 13 months of actual activity, there were 176 events that constituted an overdraft of the NM IOLTA Account[55] that were never investigated by Wells Fargo, notwithstanding its obligation under New Mexico law to do so.[56]  The activity in the NM IOLTA _which should have caused_ Wells Fargo to investigate Pettit was present almost daily from and after the commencement of activity in the account in April 2021. These events include:

  a.  The 102 discreet transfers from the NM IOLTA Account into the Pettit Personal Account;

  b.  The 4 discreet transfers from Pettit Personal Account into the NM IOLTA Account;

  c.  The 4 discreet transfers from the CP&A Operating Account (9746) into the NM IOLTA Account;

  d.  The 29 discreet transfers from the NM IOLTA to the Pettit Personal Account in satisfaction of the Argyle Mortgage;

  e.  The 61 discreet transfers from the NM IOLTA Account to Green Capital Funding LLC;

  f.  The 62 discreet transfers from the NM IOLTA Account to Mr Advance LLC;

  g.  The 51 discreet transfers from the NM IOLTA Account to Unique Funding Solutions, LLC;

  h.  The 72 discreet transfers from the NM IOLTA Account to ForwardLine Financial LLC;

  i.  The 68 discreet transfers from the NM IOLTA Account to Libertas Funding;

  j.  The 11 discreet transfers from the NM IOLTA Account to BHG Financial;

  k.  The 156 discreet transfers form the NM IOLTA Account to IRM Capital;

---

[55]  _See_ **Exhibit 23**: Table of Overdraft Events and Fees Collected

[56]  See New Mexico Rule 17-204; "The overdraft notification provisions in this rule are intended to help prevent misappropriation by providing a method for early warning of improprieties in the handling of attorney trust accounts; the two most obvious indications of possible misappropriation are a trust account overdraft or a dishonored trust account check."

l.  The 61 discreet transfers from the NM IOLTA Account to Westwood Funding for the benefit of Chris Pettit;

m.  The 41 discreet transfers from the NM IOLTA Account to Winter Park Bank for the benefit of Chris Pettit;

n.  The 25 discreet transfers from the NM IOLTA Account to American Express;

o.  The 8 discreet transfers from the NM IOLTA Account to Muebles Rusticos via Banco Santander, Mexico;

p.  The September 28, 2021 transfer to Aloha Pools for the benefit of Chris Pettit;

q.  The December 1, 2021 transfer to Ohana Outdoor Company for the benefit of Chris Pettit;

r.  The 8 discreet transfers to Barclays US Credit Card and Chase Credit Card for the benefit of Chris Pettit;

s.  The 5 discreet transfers to Wells Fargo in payment of the Wells Fargo credit cards ending in 3043 and 3050;

t.  The 77 discreet payments processed on behalf of Rustic Heritage, LLC;

u.  The 34 discreet transfers to Rustic Heritage, LLC;

v.  The 22 discreet cash withdrawals from the NM IOLTA Account in excess of $10,000.00;[57]

w.  The 8 discreet cash deposits into the NM IOLTA Account in excess of $10,000.00;[58]

x.  The attachment of a PayPal account to the NM IOLTA Account;

y.  The 11 discreet transfers via PayPal to Roblox Corp.;

z.  The 49 checks out of the NM IOLTA Account[59] returned for insufficient fees;

aa. The 79 wire transfers returned for insufficient fees, and;[60]

---

[57] All banks are required to complete Currency Transaction Reports on cash transactions greater than $10,000.00.  Law Firms are ineligible for an exemption from this requirement. 31 CFR 1020.315(e)(8)
[58] *Id.*
[59] *See* **Exhibit 24**: WF-9174-00134–274.
[60] *–Id.*

bb. The 176 discreet transactions that resulted in an NSF event or an overdraft balance in the NM IOLTA Account.

The loss in the NM IOLTA Account for the above referenced infractions totals $33,111,752.45 of which approximately $5,000,000 was money owned by the Verstuyfts, the Beyer Living Trust, and the Keunemanns.[61]

### iv. The controls employed by Wells Fargo to guard against AML violations and fraud existed *before* Pettit starting using the NM IOLTA Account

44.      Between 2011 and 2017, Wells Fargo and its affiliates incurred fines and were subject to other disciplinary measures by federal agencies for failing to comply with banking and securities regulations.  A significant portion of the fines were the result of the deficiencies in Wells Fargo's AML oversight.[62]  In 2013, in response to regulatory scrutiny, Wells Fargo reevaluated its compliance procedures and systems. Wells Fargo reportedly adopted a risk-management framework and made substantive changes to its systems and personnel, including realigning over 5,000 employees. Wells Fargo also reportedly developed and implemented technologies, including artificial intelligence software which were purportedly designed to enhance Wells Fargo's account-transaction monitoring system. In 2016, a Wells Fargo executive testified to Congress that the bank's policies, procedures, and internal controls were effective and compliant with AML laws. Thus, by the time Pettit opened the NM IOLTA Account in 2017, Wells Fargo's system of internal controls, including its company-wide compliance awareness protocols, risk management framework, and monitoring technology portfolio, provided it with the tools to readily detect Pettit's misuse of the Wells Fargo Accounts.

---

[61]    *See* **Exhibit 25**: Table of Account Activity
[62]    *See* **Exhibit 26**: Table of Violations and Fines

45.     According to the testimony of Karen Nelson, Wells Fargo employees are trained to monitor and understand account activity and Wells Fargo requires its employees to comply with banking regulations, including basic AML guidelines, as a condition of their employment. Specifically, Wells Fargo requires each employee whose duties may require such knowledge to take a 30-to-45-minute training module annually on AML compliance so that they are equipped to detect money laundering and fraud. Additionally, supervising personnel, specially designated by Wells Fargo's chief compliance officer, oversee the day-to-day implementation of the bank's risk management framework at the individual branches. The Wells Fargo Code of Ethics and Business Conduct reinforces the bank's compliance policies and directs employees to "complete all customer due diligence requirements[,] be alert to—and report—suspicious activity[,]" and sets the policy of "completing all required …. Compliance training on a timely basis."[63]  The Well Fargo Code of Ethics also states that the bank has adopted policies to comply with applicable laws relating to money laundering.[64] Bankers opening new accounts are trained to ask at least 20 fact-finding questions, including what the account is going to be used for and the client's long-term intentions for the account. New accounts that are less than 60 days old are also subject to greater scrutiny and additional limitations, including mandatory review by additional personnel.

46.     Despite the promise of reform after the imposition of fines and consent orders; after all of the implementation of policies and procedures in furtherance of those consent orders and regulatory requirements; after the assurances of Wells Fargo

---

[63]   *See* **Exhibit 27**: Wells Fargo Code of Ethics
[64]   *Id.* at pg. 111

personnel that _all_ laws and regulations are followed, Wells Fargo elected to adhere to its culture of systemic disregard for the rule of law including the cardinal rule for opening a lawyer's trust account in the State of New Mexico – ***that the signatory be an actual lawyer licensed in the State of New Mexico*** – Wells Fargo, with full and actual knowledge that Pettit failed to meet the threshold requirement to be allowed to open the NM IOLTA Account, Wells Fargo "closed the case" on what they knew to be a prohibiting condition, and allowed Pettit to open the NM IOLTA Account and literally steal millions of dollars from CP&A and the Pettit Victims.  It is undisputed, even by Wells Fargo[65], that Pettit was not licensed to practice law in the State of New Mexico.

**D. New Mexico State Bar requirements for IOLTA accounts.**

47.     The State Bar of New Mexico, like the State Bar of Texas, has promulgated the rules which must be followed as a condition to the opening and maintenance of an IOLTA account in the State of New Mexico. The State Bar of New Mexico has produced a Trust Account Manual[66] to assist lawyers and financial institutions with the management of client trust funds.  The Trust Account Manual defines trust funds to include:[67]

- Money received from client for distribution to a third party to whom the client is indebted (such as money for alimony, payment of taxes, adverse judgments, or other legal obligations)

---

[65] _See_ **Exhibit 15**: WF-00004818, **Exhibit 35**: WF-00004821–4823, and **Exhibit 22**: Letter from the Supreme Court of New Mexico containing embedded internal comment by Wells Fargo
[66] _See_ **Exhibit 19**: New Mexico Trust Account Manual
[67] _Id._ at Pg. 1

- Money received from a client for safekeeping pending the consummation of a business or investment transaction the client is contemplating and with which the attorney is providing legal assistance

- Money received from a client for safekeeping for possible distribution to a third party (such as funds to have available to settle any claims against the client which the attorney may be negotiating)

48.     The Trust Account Manual directs, in accordance with Rule 17-204 of the

Rules Governing Discipline that:[68]

- A record of all deposits into and withdrawal from each trust account identifying the date, source, and description of each item deposited as well as the date, payee, and purpose of each disbursement.  Deposit slips shall separately identify each item deposited.  Disbursements shall be made only by authorized bank transfer or check payable to a named payee but not to "cash."  An attorney licensed in this state must be a signatory on the account and that attorney shall be responsible for either making or overseeing monthly reconciliations of the checkbook

balance or general ledger, the bank statement balance, and the client trust ledger balances, and the responsibility to answer questions, including from the Disciplinary Board, regarding the client trust account. (Note: No non-lawyers may be a signatory on the trust account). The designation of one or more attorneys as the person or persons responsible to make or oversee monthly reconciliations, maintain records and answer questions pertaining to trust accounts does not relieve any other attorney from his responsibility;

49.     The rules and regulations applicable to IOLTA accounts in the State of New

Mexico include Rule 16-115, 17-204, and 24-109.  Specifically, New Mexico mandates

the following, among other requirements:

   a.   Only lawyers licensed in the State of New Mexico are eligible to have NM IOLTA accounts.

---

[68]   *Id.* at Pg. 4

      b.  It is impermissible to commingle a lawyer or law firm's funds with client funds in a client trust account except for the purpose of paying bank service charges.

      c.  Lawyers are prohibited from withdrawing cash from a client trust account.

50.  Wells Fargo has been aware at all times since the opening of the NM IOLTA Account that Pettit was the sole signatory on that account.[69]  As noted above, prior to the actual opening of the NM IOLTA Account, Wells Fargo opened its internal Case # 129755342 to investigate whether Pettit, a non-lawyer under New Mexico law, could be the sole signatory to a NM IOLTA account.  Without explaining their conclusion, "Deb" with the "Resolution Team" of Wells Fargo coordinated with "Elisa" of the NBBC for Wells Fargo and determined that Wells Fargo did not have to follow New Mexico law and permitted Pettit, a non-lawyer in New Mexico, to be the sole signatory on the NM IOLTA Account.[70]  Wells Fargo was reminded by the State Bar of New Mexico on May 12, 2021, less than a month after Pettit began misusing the NM IOLTA Account and prior to Pettit's misappropriation of nearly $30,000,000 from CP&A and the Pettit Victims, that Pettit was **_not_** a licensed New Mexico lawyer and therefore ineligible to have a New Mexico IOLTA account.[71]  Following their prior practices, Aileen Sheffer a/k/a "atsheffe" with Wells Fargo concluded that "no action" should be taken even though "Chris Pettit isn't practicing law in New Mexico…[and] no other attorneys are listed as signers on the account".[72]

---

[69]  *See* **Exhibit 9**: Account 9174 Application and Signature Cards, **Exhibit 22**: Letter from the Supreme Court of New Mexico containing embedded internal comment by Wells Fargo, **Exhibit 3**: WF-00004764 - 4770, and **Exhibit 14**: WF-00004779–4784

[70]  *Id.*

[71]  *See* **Exhibit 22**: Letter from the Supreme Court of New Mexico containing embedded internal comment by Wells Fargo

[72]  *Id.*

51.     Pettit opened the NM IOLTA account on September 21, 2017, with an initial deposit of $1,000.00.  A second $1,000.00 deposit was made on December 22, 2017. The next deposit into the NM IOLTA occurred on April 20, 2020, when a third deposit of $1,000.00 was made into the account.  No further activity occurred in the NM IOLTA account for another year.  The activity in the NM IOLTA Account changed dramatically beginning on April 15, 2021.  In the 13 months between April 15, 2021 and June 1, 2022 – the date on which Pettit and CP&A filed their voluntary chapter 11 proceedings – a total of $32,155,011.70 was deposited into the NM IOLTA Account. The deposits into the NM IOLTA Account include the following:

   a.  CP&A Deposits - $3,513,875.98[73]

   b.  1031 Exchange Deposits - $13,018,691.32[74]

   c.  Pettit Deposits - $2,445,257.29[75]

   d.  Estate Distribution Deposits - $2,238,543.72

   e.  Mineral Royalty Deposits - $2,138,705.98

   f.  Claim Resolution Deposits - $1,273,222.94

   g.  Pension Distribution Deposits - $733,559.36

   h.  Trust Distribution Deposits - $542,050.74

   i.  Annuity Payout Deposits - $374,733.94

   j.  Client Self-Disbursement Deposits - $325,035.96

   k.  Third Party Payment to Client Deposits - $185,404.53

   l.  Acting as Trustee Deposits - $91,816.24

---

[73]  *See* **Exhibit 25**: Table of Account Activity
[74]  *Id.*
[75]  *Id.*

    m.  Client IRS Refund Deposits - $3,204.59

    n.  Guardian ad litem Deposits - $1,958.33

    o.  Uncategorized Deposits - $5,295,947.78[76]

**E.  The theft of the Verstuyft and Beyer Living Trust 1031 Exchange proceeds**

52.     Between April 2021 and May 2022, Pettit undertook eighteen 1031 Exchange transactions – each of which occurred in Texas – and Wells Fargo assisted Pettit in funneling $13,018,691.32[77] through the NM IOLTA Account of CP&A only to use all or substantially all of those funds for his personal benefit and the benefit of Wells Fargo including all of the 1031 monies belonging to the Beyer Living Trust, the Kuenemanns, and the Verstuyfts.

**i.  The Verstuyft 1031 Exchange**

53.     Mark and Robin Verstuyft  were directed to Pettit and CP&A through Galm Realty and their friends, the Benkes, who were both existing clients of CP&A and who had previously utilized CP&A as a 1031 Exchange intermediary. The Verstuyfts communicated with Pettit and other employees of CP&A for the purpose of confirming the ability and willingness of CP&A to serve as the 1031 Exchange agent in connection with the proposed sale and exchange of a portion of their family farmland located in Bexar County, Texas, and regarding advice offered by Pettit related to the duration, tax benefits, and other opportunities related to use of the 1031 Exchange program.  Pettit made written and oral representations to the Verstuyfts regarding the safekeeping and segregation of their 1031 Exchange proceeds.  Pettit further recommended that Pettit be engaged to

---

[76]  *Id.*
[77]  *See* **Exhibit 28**: Table of 1031 Exchanges

No. 24-229
*Verstuyft, et al v. Wells Fargo Bank, N.A.*
Original Complaint        Page 35 of 59

prepare the tax returns for the Verstuyfts following the deposit of the 1031 Exchange proceeds. Pettit assured the Verstuyfts that their funds would be safe because such funds would be on deposit with Wells Fargo.  He further assured the Verstuyfts that they were each insured for up to $10,000,000 on each 1031 exchange transaction.  The Verstuyfts accepted the advice and representations of Pettit regarding the 1031 Exchange duration, tax benefits, and other opportunities and relied on the representations regarding the safekeeping with Wells Fargo. The Verstuyfts took great comfort in knowing that their funds would be held at Wells Fargo.  Pettit, on behalf of CP&A confirmed that CP&A would serve as the "qualified intermediary for a possible 1031 exchange" and provided that confirmation to Martin Abstract Co., Inc., the title company engaged by the Verstuyfts to close the proposed transaction.   The confirmation by Pettit occurred by written correspondence dated January 27, 2022 and advised both Martin Abstract Co. and the Verstuyfts of the following:

> Our law firm's escrow account is with Wells Fargo Bank.  At the time of closing and funding, Mr. Verstuyft's portion of the proceeds would be distributed as follows:
>
> Receiver:  Chris Pettit & Associates, P.C. as qualified intermediary for Mark Verstuyft
> Receiving Bank:  Wells Fargo Bank
> Routing Number:  121000248
> Account Number:  2537419174
> Reference: Mark Verstuyft
> Taxpayer Identification number: 74-2801267

The January 27 correspondence was signed by Pettit and acknowledged by Mark Verstuyft:

Very truly yours,
CHRIS PETTIT & ASSOCIATES, P.C.

Christopher J. Pettit
CJP:sas

Very truly yours,

Mark Verstuyft

54.     The Verstuyfts closed the first leg of the 1031 Exchange by the sale of a portion of their family farm on April 18, 2022.  Martin Abstract Co. remitted, via wire transfer, the sum of $2,902,911.55 (the "Verstuyft 1031 Deposit") to the NM IOLTA Account.  The Verstuyft 1031 Deposit was received in the NM IOLTA Account on April 18, 2022 as evidenced by the April NM IOLTA Account statement.

April 30, 2022 ■ Page 5 of 12



**Transaction history(continued)**

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 4/15 | < | Business to Business ACH Debit - Irm Capital Irm Capita 220414 56136 Chris Pettit Assoc... | | 4,216.00 | |
| 4/15 | < | Business to Business ACH Debit - Irm Capital Achpayment 220414 W069 Chris Pettit Associat | | 2,000.00 | |
| 4/15 | < | Business to Business ACH Debit - Csc 4152022 Default Recp ID Chris Pettit & Associa | | 34.90 | |
| 4/15 | | Paypal Inst Xfer 220415 Roblox Corp Christopher Pettit | | 99.99 | 336.58 |
| 4/18 | | NSF Return Item Fee for a Transaction Received on 04/15 $31,766.67 Check # 02752 | | 35.00 | |
| 4/18 | | State Sales Tax | | 2.36 | |
| 4/18 | | Deposit Made In A Branch/Store | 23,369.25 | | |
| 4/18 | | WT Fed#00018 First Commercial B /Org=Martin Abstract Company Inc Srf# 0000206218 Trn#220418164317 Rfb# | 2,902,911.55 | | |

55.     The Verstuyfts, all the while believing the representations of Pettit, later learned that in a mere *11 days* following the receipt of the Verstuyft 1031 Deposit, Wells Fargo permitted Pettit to drain the account resulting in a negative balance in the NM IOLTA Account as of April 29, 2022.

April 30, 2022 ■ Page 10 of 12



---

*Transaction history(continued)*

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------|-------------|---------|-----------|---------|
| 4/29 | | Interest Payment | 112.96 | | |
| 4/29 | | Int Transferred to NM 000001060470705 | | 112.96 | -519.33 |
| | | **Ending balance on 4/30** | | | -519.33 |
| | | **Totals** | **$3,789,005.36** | **$3,790,692.56** | |

56.    As is discussed below, at the time of the acceptance of the Verstuyft 1031 Deposit Wells Fargo had *actual knowledge* that Pettit was not legally eligible to control the NM IOLTA Account and, on information and belief was aware of the ongoing criminal investigation of Pettit by the U.S. Department of Justice.  In the span of a mere 11 days, Wells Fargo enabled the looting of the Verstuyft 1031 Deposit by Pettit by permitting Pettit to:

a.   Make 15 transfers to the Pettit Personal Account totaling $375,000, including 2 payments made to Wells Fargo for the Argyle Mortgage;

b.   Make 87 transfers to persons/entities unrelated to the Verstuyfts;

c.   Make 1 transfer to Pettit at his personal Martha's Vineyard account;

d.   Make 1 transfer to Pettit's brother;

e.   Make 5 transfers to new CP&A accounts opened at Wells Fargo;

f.   Make 27 transfers to litigation funding entities including Libertas Funding, IRM Capital, and Principal Financial;

g.   Make 7 payments to utility service providers including AT&T, SAWS, and Waste Management;

h.   Make 18 additional payments to third parties for the stated benefit of Pettit;

i.   Make 2 cash withdrawals totaling $25,000;

j.   Make 107 payments via check to persons/entities unrelated to the Verstuyfts, and;

---

k.  Make 1 payment to Wells Fargo identified as "NSF Return Item Fee"[78].

57.      Each of the transactions delineated immediately above are either wholly outside the scope of the use of a lawyer's trust account and/or clearly outside the scope of the use of trust funds earmarked for the Verstuyfts. In light of the multitude of irregular transactions predating the Verstuyft Deposit, these transactions should have been subjected to further scrutiny by Wells Fargo, which did not occur based upon the stipulation by counsel for Wells Fargo.  The payment of NSF Return Item Fee is in direct violation of Wells Fargo's own policies and procedures related to IOLTA accounts. The NSF Return Item Fee and the payments on the Argyle Mortgage represent the misappropriation of the Verstuyft Deposit by Wells Fargo and, as applicable WFNBW. Because Wells Fargo had actual knowledge of the fact that Pettit was legally disqualified from being a – much less the sole – signatory on the NM IOLTA Account, had been reminded of Pettit's unauthorized status by the State Bar of New Mexico by written correspondence on May 12, 2021,[79] and had actual knowledge of a multitude of irregular if not outright illegal transactions by Pettit in the NM IOLTA Account, Wells Fargo had a duty to investigate each of these discreet transactions, which duty Wells Fargo simply ignored.[80]

ii.    **The Beyer Living Trust 1031 Exchange**

58.      The Beyer Living Trust is a former client of CP&A and Pettit.  In fact, Pettit was the attorney that prepared the Beyer Living Trust Agreement.  This Beyer Living Trust

---

[78]   See **Exhibit 32**: April 2022 Statement for Account *9174
[79]   *See* **Exhibit 22**: Letter from the Supreme Court of New Mexico containing embedded internal comment by Wells Fargo
[80]   *See* **Exhibit 13**: ECF 885, ¶d – e, page 4.

was created to hold the assets of the parents of Ken and Earl Beyer who are the beneficiaries of the Beyer Living Trust. Upon the death of their father, Ken and Earl Beyer became co-trustees of the Beyer Living Trust. As Co-trustees, the Beyers once again sought the advice of Pettit regarding how the Beyer Living Trust should plan for the possible capital gain on property owned by the Trust. Pettit then sold the Beyers on the idea of "reverse 1031 exchanges". Pettit represented to the Beyer Living Trust that it could sell the property and he would place the proceeds of the sale in a CP&A trust account. Pettit proposed to draft amendments to the Beyer Living Trust Agreement to create "Sub-Trusts" which would hold the proceeds from the sale on the personal residences of each of Ken and Earl Beyer. The funds could then be commingled into a single transaction. Pettit represented that this "reverse 1031" would then save the Beyers and the Beyer Living Trust on capital gains tax from the sale of their respective properties.[81]  Pursuant to Pettit's advice, on May 10, 2022, the Beyer Living Trust sold a parcel of real estate located at 1104 Impala Drive, Granite Shoals, Texas. Pettit served as the attorney for the Beyer Living Trust as the seller in this transaction. Pettit, on behalf of CP&A confirmed that CP&A would serve as the "qualified intermediary for a possible 1031 exchange" and provided that confirmation to Capital Title, the title company engaged by the Beyer Living Trust to close the proposed transaction. The confirmation by Pettit occurred by written correspondence dated May 4, 2022. Upon closing and funding, the net proceeds of that sale were wired to the NM IOLTA account of CP&A.

---

[81]  Obviously the "reverse 1031 exchange" was nothing more than another lie by Pettit in attempt to set the hook for his next scam which would have been stealing the proceeds from the Beyer's personal residences. Fortunately, for Ken and Earl Beyer, the second part of the "reverse 1031 exchange" did not happen.

---

More specifically, on May 11, 2022, the $1,162,786.17 was wired to Wells Fargo Bank account number xxxxxx9174 (the "Beyer 1031 Deposit"). At the time these net proceeds were received by Chris Pettit & Associates P.C. there was a negative balance in the NM IOLTA Account as it was overdrawn by $820.91.

59.     In the *6 days* following the receipt of the Beyer Living Trust 1031 Deposit, Wells Fargo permitted Pettit to drain the account resulting in a negative balance in the NM IOLTA Account as of May 17, 2022.

60.     Wells Fargo enabled the looting of the Beyer Living Trust 1031 Deposit by Pettit by permitting Pettit to:

a.  Make 3 transfers to the Pettit Personal Account totaling $80,000.00;

b.  Make a $492,159.70 transfer to Escrow Funding Inc. for payment on a residence held by Pettit, or an entity controlled by Pettit, in New Orleans Louisiana;

c.  Make 8 transfers to new CP&A accounts at Wells Fargo;

d.  Make 16 transfers to litigation funding and merchant account lenders entities including Libertas Funding, IRM Capital, and Unique Funding Solutions for a total of $101,065.15;

e.  Make 15 payments via bank wire or ACH transfer to third parties for the stated benefit of Pettit including $80,000.00 to bankruptcy counsel and $100,000.00 to Pettit's criminal defense counsel;

f.  Make 28 payments via check to persons/entities unrelated to the Beyer Living Trust including payments to Pettit's brother and Facebook;

g.   Make a cash withdrawal of $10,000.00; and

h.  Make 7 payments to Wells Fargo identified as "NSF Return Item Fee."[82]

In fact, the payment of NSF Return Item Fee is in direct violation of Wells Fargo's own

---

[82]   See **Exhibit 33**: May 2022 Statement for Account *9174

policies and procedures related to IOLTA accounts.[83]   At the time of the acceptance of the Beyer1031 Deposit Wells Fargo had *actual knowledge* that Pettit was not legally eligible to control the NM IOLTA Account and, on information and belief, was aware of the ongoing criminal investigation of Pettit by the U.S. Department of Justice.

### iii.  The Kuenemann 1031 Exchange

61.    Gordon and Wendy Kuenemann were directed to Pettit and CP&A through Galm Realty who served as the broker for the Kuenemanns in connection with their 1031 Exchange transaction which occurred on November 4, 2021.   The Kuenemann transaction was closed through Stewart Title Co. and resulted in the transfer of $907,577.58 into the NM IOLTA Account (the "Kuenemann 1031 Deposit"):

## Interest on Lawyers Trust Account
November 30, 2021 ■ Page 1 of 12

WELLS
FARGO

CHRIS PETTIT & ASSOCIATES PC
NM IOLTA ACCT
11902 RUSTIC LN
SAN ANTONIO TX 78230-1418

**Questions?**
Available by phone 24 hours a day, 7 days a week
We accept all relay calls, including 711
**1-800-CALL-WELLS**   (1-800-225-5935)
En español: 1-877-337-7454

Online:  wellsfargo.com/biz
Write:  Wells Fargo Bank, N.A. (585)
        P.O. Box 6995
        Portland, OR  97228-6995

---

[83]    See **Exhibit 34**: WF-00004868 – 4949 at WF-00004870

November 30, 2021 ■ Page 2 of 12



---

## Transaction history

| 11/4 | WT 16991719 Stewart Title CO /Org= Srf# 16991719 Trn#211104140720 Rfb# | 907,577.58 |
|------|--------|-----|

Pettit communicated with the Kuenemanns providing them with the following confirmations on November 8, 2021:

November 8, 2021

Mr.& Mrs. Gordon Kuenemann

RE:  1031 exchange receipt of funds

Dear Mr. & Mrs. Kuenemannr:

I am writing to confirm that you would be placing on deposit with our law firm the sum of $907,577.58 which we hold in trust for you pending the completion of your 1031 exchange sale and purchase. As discussed, our law firm's escrow account is with Wells Fargo Bank. Your deposit is FDIC insured and is also insured up to $10,000,000.00 through our errors and omissions coverage.

These funds may be withdrawn at any time of your direction.   The funds will earn interest on deposit with our firm and the interest and principle will be distributed pursuant to your request.  No funds will be disbursed without your approval.

Upon completion of your 1031 exchange, all remaining funds, both principle and interest, held in escrow will be distributed to you.

As always, please do not hesitate to contact me if you are in need of additional information or assistance.

Very truly yours,
CHRIS PETTIT & ASSOCIATES, P.C.

Christopher J. Pettit

62.     Pettit made written and oral representations to the Kuenemanns regarding the safekeeping and segregation of their 1031 Exchange proceeds.   Pettit further recommended that Pettit be engaged to prepare the tax returns for the Kuenemanns following the deposit of the 1031 Exchange proceeds. Pettit assured the Kuenemanns verbally and in writing that their funds would be safe because it would be on deposit with Wells Fargo.   The Kuenemann accepted the advice and representations of Pettit regarding the 1031 Exchange duration, tax benefits, and other opportunities and relied on the representations regarding the safekeeping with Wells Fargo.

63.     By April 2022 the Kuenemanns had identified two properties to purchase with their 1031 Exchange funds.  They had entered into the contracts to purchase both of these properties and had notified Pettit of the scheduled closing dates.  The Kuenemanns attempted to obtain the Kuenemann 1031 Deposit from Pettit, but because the funds had been completely consumed by Pettit under the watchful eye of Wells Fargo, Pettit was

nonresponsive to the request of the Kuenemanns for access to the Kuenemann 1031 Deposit.  As a direct result of the theft by Pettit which was not only aided but facilitated by Wells Fargo, the Kuenemanns were required to borrow funds sufficient to close on the two properties they had identified as part of their 1031 Exchange.  The Kuenemanns have been damaged by the actions of Wells Fargo in an amount not less than $907,577.58 together with interest costs, lost profits, and attorney's fees.

**F.    Wells Fargo failed to stop Pettit in favor of its own financial gain.**

64.    In the face of the actual knowledge that Pettit was not legally eligible to be the signatory on NM IOLTA Account, Wells Fargo knowingly permitted, and in some circumstances actually assisted, Pettit in violating New Mexico law regarding the opening and maintenance of lawyer trust accounts. The incidences, all of which are prohibited under applicable law, included:

a. Knowingly permitting a person without a New Mexico law license to be the sole signatory on the NM IOLTA Account;

b. Knowingly permitting and assisting Pettit in making 50 discreet cash withdrawals totaling $1,215,161.89 from the NM IOLTA Account;

c. Knowingly permitting and assisting Pettit in making 4 discreet transfers from the CP&A operating account (9746) totaling $58,100.00 into the NM IOLTA Account;

d. Knowingly permitting and assisting Pettit in making 4 discreet transfers from the Pettit Personal Account totaling $1,431,490.00 into the NM IOLTA Account;

e. Knowingly permitting and assisting Pettit in making 102 discreet transfers into the Pettit Personal Account totaling $2,115,459.00 from the NM IOLTA Account;

f. Knowingly permitting and assisting Pettit in making 1 discreet transfer into his personal account ending in 2925 at Martha's Vineyard Bank in the amount of $30,000.00 from the NM IOLTA Account;

g.  Knowingly permitting and assisting Pettit in making 11 discreet transfers into his personal account ending in 1524 at Winter Park Bank totaling $237,500.00 from the NM IOLTA Account;

h.  Knowingly permitting and assisting Pettit in making 1 discreet transfer into the account ending in 2043 at Winter Park Bank for which Pettit is the Ultimate Beneficial Owner in the amount of $1,000.00 from the NM IOLTA Account;

i.  Knowingly permitting and assisting Pettit in making 1 discreet transfer into the account ending in 2050 at Winter Park Bank for which Pettit is the Ultimate Beneficial Owner in the amount of $1,000.00 from the NM IOLTA Account;

j.  Knowingly permitting and assisting Pettit in making 1 discreet transfer into the account ending in 2068 at Winter Park Bank for which Pettit is the Ultimate Beneficial Owner in the amount of $1,000.00 from the NM IOLTA Account;

k.  Knowingly permitting and assisting Pettit in making 29 discreet transfers from the NM IOLTA Account to pay the Argyle Mortgage to Wells Fargo; and

l.  Knowingly permitting and assisting Pettit in using CP&A funds transferred from Frost Bank, Winter Park Bank and Bank of San Antonio

65.    When Wells Fargo opened the NM IOLTA Account, it understood the restrictions and rules governing lawyer trust accounts in New Mexico and it was aware of the sort of activity that was authorized under New Mexico law for IOLTA accounts. Wells Fargo is identified as a "Leadership Circle" depository institution by the New Mexico State Bar. New Mexico law requires all banks that will serve as an IOLTA depository to agree in writing that such bank will adhere to the regulations outlined by the New Mexico Supreme Court.  It likely did or certainly should have forecasted that the NM IOLTA Account would be used in a manner consistent with a law firm of its size and with a practice focused on Wills, Estates, Probate, and Personal Injury. Wells Fargo should have, and FFEIC _required_ that it monitor the NM IOLTA Account activity with those

parameters in mind.  But from the very start, and throughout the time that followed, Pettit's use of the NM IOLTA Account bore no resemblance to that predicted activity. Instead, the account activity should have triggered one Red Flag warning after another at Wells Fargo. Unfortunately, Wells Fargo ignored each of the dozens of red flags and assisted Pettit in perpetrating the fraud and breach of fiduciary duty on the Pettit Victims described in this Complaint.

## G. Wells Fargo has a culture of disregarding its own policies and procedures as well as applicable laws and regulations in favor of profits without regard to the consequences to those like the Pettit Victims.

66.    Wells Fargo has a well-documented history of disregarding its legal responsibilities in favor of shareholder profit.  Thanks to federal oversight, Wells Fargo has been subject to multiple Consent Orders and, not long after bending the rules for Pettit, Wells Fargo was subjected to what the American Banker called a "novel condition" of operations effective February 2, 2018 when the Federal Reserve Board of Governors imposed an "asset cap order" on Wells Fargo prohibiting it from growing beyond its $1.95 trillion asset size – the size of Wells Fargo as of December 31, 2017.[84]  According to the American Banker, "[t]he unprecedented move was the central bank's long-awaited response to a _litany of scandals_ that had embroiled [Wells Fargo] in the prior several years.  The most visible of those scandals related to bank employees opening millions of unauthorized credit cards and checking accounts…."[85] (emphasis added). As reported in the American Banker, the Federal Reserve confirmed that the asset cap order was issued

---

[84]    Kyle Campbell & Polo Rocha, Wells Fargo's asset cap is turning 5. how will it end? _American Banker_ (2023),        https://www.americanbanker.com/news/wells-fargos-asset-cap-is-turning-5-how-will-it-end (last visited Apr 11, 2023).
[85]    _Id._

"in response to "widespread consumer abuses and other _compliance breakdowns_" at the bank and would remain in place "until it sufficiently improves its governance and controls""[86] (emphasis added).

67.     From the perspective of the Pettit Victims, it is understandable why the Federal Reserve left the asset cap order imposed on Wells Fargo in place for over five years.  2021 was a particularly fine-filled year for Wells Fargo resulting from its continuing and chronic failure to address its systemic disregard of applicable laws and regulations. Just in the period between April 2021 and March 2023, Wells Fargo has received in excess of **_Four Billion Dollars_** in fines relating to the systemic failures:

| Penalty Date | Penalty Amount | Description | Agency |
|---|---|---|---|
| 3/30/2023 | 67,762,500 | The Federal Reserve Board fined Wells Fargo & Co. for the firm's unsafe or unsound practices relating to historical inadequate oversight of sanctions compliance risks at its subsidiary bank, Wells Fargo Bank, N.A. Wells Fargo & Co.'s deficient oversight enabled the bank to violate U.S. sanctions regulations by providing a trade finance platform to a foreign bank that used the platform to process approximately $532 million in prohibited transactions between 2010 and 2015. | Federal Reserve |
| **3/30/2023** | 30,000,000 | The Office of Foreign Asset Control announced that Wells Fargo Bank agreed to settle potential civil liability for 124 apparent violations from 2008 until 2015 Wells Fargo, and its predecessor, Wachovia Bank, provided a foreign bank with software used to process trade finance transactions with U.S.-sanctioned jurisdictions and persons. | Office of Foreign Assets Control |
| **12/20/2022** | 3,700,000,000 | The Consumer Financial Protection Bureau ordered Wells Fargo Bank to pay more than $2 billion in redress to consumers and a $1.7 billion civil penalty for legal violations across several of its largest product lines. The CFPB stated the bank's illegal conduct led to billions of dollars in financial harm to its customers. Consumers were said to have been illegally assessed fees and interest charges on auto and mortgage loans, had their cars wrongly repossessed, and had payments to auto and mortgage loans misapplied by the bank. | Consumer Financial Protection Bureau |

---

[86]  _Id._

---

No. 24-229
_Verstuyft, et al v. Wells Fargo Bank, N.A._
Original Complaint

| Penalty Date | Penalty Amount | Description | Agency |
|---|---|---|---|
| 9/1/2022 | 22,000,000 | OSHA found that Wells Fargo violated the whistleblower protection provisions of the Sarbanes-Oxley Act for improperly terminating a Chicago area-based senior manager in the company's commercial banking segment. The senior manager had repeatedly voiced concerns to area managers and the corporate ethics line regarding conduct they believed violated relevant financial laws, including wire fraud.  The manager expressed concerns that they were directed to falsify customer information and alleged that management was engaged in price fixing and interest rate collusion through exclusive dealing. | Occupational Safety & Health Administration |
| 5/20/2022 | 7,000,000 | The Securities and Exchange Commission announced charges against Wells Fargo Advisors for failing to file at least 34 Suspicious Activity Reports (SARs) in a timely manner between April 2017 and October 2021. Wells Fargo Advisors agreed to pay $7 million to settle the charges. | Securities and Exchange Commission |
| 9/27/2021 | 72,600,000 | Federal prosecutors settled a civil fraud lawsuit against Wells Fargo Bank, N.A. alleging that it violated the Financial Institutions Reform Recovery and Enforcement Act by fraudulently overcharging customers, including small businesses and federally insured financial institutions, which used the bank's foreign exchange service.  The United States alleged that, from 2010 through 2017, Wells Fargo FX sales specialists defrauded customers by systematically charging higher markups on FX transactions than they represented the bank would charge and concealing these overcharges through various misrepresentations and deceptive practices. | U.S. Attorney- Southern District of New York |
| 9/9/2021 | 250,000,000 | Unsafe or unsound practices related to material deficiencies regarding the bank's loss mitigation activities, including loan modification decisions and operational practices, and inadequate Independent Risk Management and Internal Audit of the bank's loss mitigation activities. | Office of the Comptroller of the Currency |

68.    The chronic disregard by Wells Fargo of its duties and obligations to depositors and those who deal with depositors that manage trust funds must be addressed by this Court in a manner that will, once and for all, impress upon Wells Fargo that it will no longer be permitted to turn a blind eye to the damage being visited upon others for the sake of its own profitability.

## V.
## APPLICABLE LAW

**Texas law applies to the determination of the torts of breach of fiduciary duty and fraud perpetrated by Pettit and Wells Fargo against CP&A and the Pettit Victims.**

69.    Each of the Plaintiffs are Texas residents. Virtually all of the deposits into the NM IOLTA Account and withdrawals from the NM IOLTA Account originated from transactions occurring in the State of Texas.  The NM IOLTA Account was opened at branch of Wells Fargo located in San Antonio, Texas. Each of the 1031 Exchanges and the resulting deposits into the NM IOLTA Account involved real estate transactions that occurred in Texas and were processed through title companies located in Texas.

## VI.
## CAUSES OF ACTION

### COUNT I
### Joint Tortfeasor Liability for Knowing Participation in the Breach of the Fiduciary Duty of Pettit to the Clients of CP&A by Wells Fargo

70.    Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 65 as if fully set forth herein.

71.    As discussed above, Pettit has been found liable for the breach of his duty in connection with the Pettit Victims and the use of the NM IOLTA Account by the United States Bankruptcy Court and has been sentenced to 50 years in prison in this Court for his behavior.

72.    Wells Fargo knowingly allowed the NM IOLTA Account to be opened by Pettit who was prohibited under New Mexico law from being a signatory, much less the sole signatory, on a New Mexico IOLTA account.  Wells Fargo permitted the NM IOLTA Account to be operated in a manner that bore no reasonable resemblance to how trust

accounts should actually be used. Wells Fargo had actual knowledge of the breach of fiduciary duty perpetrated by Pettit. Wells Fargo knew that the NM IOLTA Account had been illegally opened and used by Pettit to facilitate the deposit and withdrawal of nearly $34 million over a period of approximately ***13 months***.  Wells Fargo had actual knowledge that Pettit used the funds in the NM IOLTA Account at least 29 times in that 13-month period ***to pay his personal mortgage obligations to Wells Fargo***. Wells Fargo had actual knowledge of the chronic misuse of the NM IOLTA Account by Pettit and elected to disregard those actions in violation of its duty.[87]   Wells Fargo knew that its actions in permitting deposits into and withdrawals out of the NM  IOLTA Account constituted a bad faith disregard of the duties of Wells Fargo to investigate the activities in the NM IOLTA Account ***at a minimum*** from and after the notification by the State Bar of New Mexico on May 12, 2021 – approximately 30 days after the first actual activity in  NM IOLTA and more than 6 months *prior to* the theft of the Kuenemann 1031 Deposit,  11 months *prior to* the misappropriation of the Verstuyft 1031 Deposit,  and one year *prior to* the Beyer Living Trust 1031 Deposit.[88] The vast majority of the NM IOLTA Account transactions at issue in this case were improper on their face. Wells Fargo witnessed, and in some instances actually participated in, the clear and unambiguous events of misappropriation of the trust funds on deposit in NM IOLTA Account by facilitating the transfers for Pettit. With the actual knowledge and endorsement of the illegal opening of the NM IOLTA Account, Wells Fargo had a duty to investigate each of these events and it acted in bad

---

[87] *Wichita Royalty Co. v. City Nat'l Bank*, 127 Tex. 158, 89 S.W.2d 394 (1935); *Wichita Royalty Co. v. City Nat'l Bank*, 306 U.S. 103, 59 S.Ct. 420, 83 L.Ed. 515 (1939); *Wichita Royalty Co. v. City Nat'l Bank*, 109 F.2d 299 (5th Cir. 1940).
[88] *Id.*

faith when it *chose* not to investigate or otherwise take action to protect Plaintiffs' funds in violation of applicable Texas law.[89]

73.    Wells Fargo substantially benefited from the scheme perpetrated by Pettit, due not only to the substantial additional funds flowing through the bank as a result of the magnitude of the scheme, but because of the use of the trust funds from the NM IOLTA Account to pay the Argyle Mortgage, make over a million dollars on cash withdrawals, and Wells Fargo's permitting the direct attachment of a PayPal account to the NM IOLTA Account. Through the scheme Wells Fargo earned income from fees and from investing capital derived from the  Pettit Victims, including the Verstuyfts, the Beyer Living Trust, and the Kuenemanns.

74.    The evidence shows that but for the willingness of Wells Fargo to enable Pettit the losses incurred through the NM IOLTA Account could not have occurred. The actual and foreseeable result of the conduct of Wells Fargo was the loss of funds in the NM IOLTA Account and the Texas IOLTA Account.  Those gross losses total at least $33,111,752.45[90] and the direct losses to the Verstuyfts, the Beyer Living Trust, and the Kuenemanns total approximately $5,000,000.00 of that amount.

**COUNT II**
**Joint Tortfeasor Liability for Knowing Participation in the Perpetration of Fraud by Pettit Against the Clients of CP&A — by Wells Fargo**

75.    Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 65 as if fully set forth herein.

76.    As discussed above, Pettit has been found liable for fraud in connection

---

[89] *Id.*
[90] *Id.*

with the Pettit Victims and the use of the NM IOLTA Account by the United States Bankruptcy Court and has been sentenced to 50 years in prison in this Court for his behavior.

77.     Pettit intentionally misrepresented and omitted material facts in connection with the use of the NM IOLTA Account and the intention of Pettit regarding the solicitation and acceptance of 1031 Exchange transactions, expressly including the 1031 Exchange transactions of the Beyer Living Trust, the Kuenemanns, and the Verstuyfts. Plaintiffs reasonably relied to their detriment on such representations and omissions by depositing their money in the NM IOLTA Account at Wells Fargo and utilizing Pettit as a "qualified" 1031 Exchange intermediary.  In the absence of the misrepresentations by Pettit, neither the Kuenemanns, the Verstuyfts, nor the Beyer Living Trust would have made these deposits or permitted the transactions to occur.  Wells Fargo knowingly and substantially provided material assistance to Pettit in furtherance of his scheme to defraud the Kuenemanss, the Verstuyfts, and the Beyer Living Trust. Wells Fargo knowingly allowed the NM IOLTA Account to be opened in violation of New Mexico law and to be operated in violation of applicable federal regulations and in a manner that bore no reasonable resemblance to how such trust accounts should actually be used.

78.     Wells Fargo knew that the NM IOLTA Account had been created in violation of New Mexico law and yet facilitated and permitted the deposit and withdrawal of nearly $34 million from the account in less than 13 months, including permitting in excess of $116,900.53 to paid by Pettit to the Argyle Mortgage, $2,115,459.00 to be transferred directly to the Pettit Personal Account, and $1,215,161.89 in cash withdrawals in direct violation of New Mexico law and without accurate CTR reporting compliance, among the

host of other improper payments from an IOLTA account. Wells Fargo witnessed systematic, continuous evidence of probable money laundering and fraudulent activity, yet took no action to stop the misconduct, and instead substantially assisted the continued operation of the NM IOLTA Account to perpetrate the scheme and continued to execute all requested banking transactions involving the NM IOLTA Account even after actual notification by the New Mexico Supreme Court regarding the lack of legal authorization of Pettit to open the NM IOLTA Account.

79.    Wells Fargo benefited from its participation in Pettit's scheme by earning income from fees, using inflows to boost its deposit average metrics, and from investing capital derived from the 1031 Exchanges, including those of the Kuenemanns, the Verstuyfts, and the Beyer Living Trust. As a direct and proximate consequence of Wells Fargo's conduct as described in this complaint, The Kuenemanns, the Verstuyfts, and the Beyer Living Trust have each lost significant funds they entrusted to Wells Fargo and the NM IOLTA Account, have been denied the use of those funds, and have been damaged in an amount to be determined at trial.

## COUNT III
## Negligence and Gross Negligence

80.    Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 65 as if fully set forth herein.

81.    Plaintiffs advance this count in the alternative to their other claims.

82.    As discussed above, Pettit has been found liable for negligence in connection with the Pettit Victims and the use of the NM IOLTA Account by the United States Bankruptcy Court and has been sentenced to 50 years in prison in this Court for his behavior.

83.     At all relevant times, Pettit caused funds belonging to Plaintiffs to be deposited into the NM IOLTA Account at Wells Fargo. Wells Fargo knew the deposits were to be held in trust, but also knew the funds were being misappropriated for the personal use of Pettit, including for payment of Pettit's personal debts to Wells Fargo. Wells Fargo knew that the funds deposited into the NM IOLTA Account were not funds being held in a manner consistent with any of the norms and requirements applicable to lawyer trust accounts.

84.     Wells Fargo owed a duty to Plaintiffs with respect to the maintenance and use of the NM IOLTA Account starting from the first moment that Wells Fargo became aware that the NM IOLTA Account was not opened or being operated in accordance with applicable law.  The Pettit Victims contend that Wells Fargo's duty arose at the event of the opening of the NM IOLTA Account, but in no event later than the first withdrawal by Pettit of funds out of the NM IOLTA Account.

85.     Wells Fargo breached its duty to Pettit Victims when, among other things, it allowed the NM IOLTA Account to be operated in a manner that bore no reasonable resemblance to how such accounts are required to be used: Wells Fargo allowed Pettit to repeatedly transfer funds from the NM IOLTA Account to (1) pay his personal debt to Wells Fargo, including the debt owed to Wells Fargo on the 555 Argyle property; (2) withdraw of over a million dollars in cash from the NM IOLTA Account in violation of New Mexico law; (3) transfer hundreds of thousands of dollars to the Pettit Personal Account; (4) transfer hundreds of thousands of dollars to other Pettit accounts and Pettit creditors. Wells Fargo witnessed systematic, continuous evidence of money laundering and fraudulent activity, for which Pettit has been convicted and sentenced, but took no action

to stop the misconduct, and instead facilitated the continued operation of the NM IOLTA Account to perpetrate the scheme and continued to execute all requested banking transactions involving the NM IOLTA Account, Wells Fargo knowingly disregarded its own policies and procedures as well as federal regulations by repeatedly failing to investigate the innumerable indicia of fraud and stop the misuse of the NM IOLTA Account.

86.     As a direct and approximate cause of the breach by Wells Fargo of the duty as described throughout this Complaint, the Pettit Victims have sustained damages in an amount to be determined at trial.

## COUNT IV
## Texas Theft Liability Act – Wells Fargo and Wells Fargo National Bank West

87.     Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 65 as if fully set forth herein.

88.     The Texas Theft Liability Act (the "Theft Act") is an available recovery for persons who are the victim of certain types of theft.  The Theft Act defines a "Person" to be "an individual, partnership, corporation, association, or other group, however organized." TX. Civ. Prac. & Rem. Code §134.001(1).  The Theft Act defines "Theft" as unlawfully appropriating property or unlawfully obtaining services as described by Section 31.03, 31.04, 31.06, 31.07, 31.11, 31.12, 31.13, or 31.14, Penal Code.  TX. Civ. Prac. & Rem. Code §134.001(2).   The recovery available to a Person who has suffered a Theft is "the amount of actual damages found by the trier of fact and, in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1,000".  TX. Civ. Prac. & Rem. Code §134.005(1).  Additionally, a successful plaintiff is entitled to the recovery of attorneys' fees and expenses.

89.    Each of the Kuenemanns, the Verstuyfts, and the Beyer Living Trust had a possessory right to their funds deposited into the NM IOLTA Account for their respective benefits.  These funds include the Verstuyft 1031 Deposit, the Beyer 1031 Deposit, and the Kuenemann 1031 Deposit.    Wells Fargo and, as applicable, WFNBW unlawfully appropriated these funds by taking them or permitting them to be taken through a multitude of discreet Theft events without the consent of any of the Pettit Victims.

90.    Wells Fargo acting both in concert with Pettit and individually appropriated the a portion of the and permitted Pettit to appropriate the funds on deposit in the NM IOLTA Account which funds are fiduciary property by virtue of the deposit of those funds into the NM IOLTA Account.  These funds were taken intentionally which deprived each of the Kuenemanns, the Verstuyfts, and the Beyer Living Trust of their funds through discreet transactions occurring between November 2021 and May 2022. As a result, each of the Pettit Victims sustained damages resulting from the Thefts perpetrated by Pettit and Wells Fargo/WFNBW. As permitted by the Theft Act, the Kuenemanns, the Verstuyfts, and the Beyer Living Trust seek all additional damages permitted under the statute including attorneys' fees, expenses, actual damages, and punitive damages.

## EXEMPLARY AND PUNITIVE DAMAGES FOR PLAINTIFFS

91.    The Verstuyfts, the Beyer Living Trust and Kuenemanns each also seek exemplary and punitive damages in order to penalize Wells Fargo, and as applicable WFNBW for conduct that was outrageous, malicious, or otherwise morally culpable.

92.    Furthermore, the Verstuyfts, the Beyer Living Trust and Kuenemanns request exemplary damages in excess of any statutory cap as the conduct of Wells Fargo and, as applicable, WFNBW constitutes a knowing, intentional or reckless misapplication

of fiduciary property[91] together willful and chronic violations of long standing banking rules, regulations, and policies which govern them.

## JURY DEMAND

93.    Pursuant to the terms of the Stipulation entered in Adversary No. 23-05039 pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, the parties have agreed that this matter will be tried by a jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED Plaintiffs respectfully request that the Court grant them following relief:

1.    <u>On Count I</u> – Enter judgment in favor of Plaintiffs and against Wells Fargo and award Plaintiffs compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of this Defendant's conduct and its financial ability to pay;

2.    <u>On Count II</u> Enter judgment in favor of Plaintiffs and against Wells Fargo and award Plaintiffs compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of this Defendant's conduct and its financial ability to pay;

3.    <u>On Count III</u>– Enter judgment in favor of Plaintiffs and against Wells Fargo, and award Plaintiffs compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of this the conduct of Wells Fargo and its financial ability to pay;

---

[91]    See Tex. Civ. Prac. & Rem Code §41.008(c)(10)

4.     <u>On Count IV</u> – Enter judgment in favor of Plaintiffs and against Wells Fargo and WFNBW, jointly and severally, and award Plaintiffs compensatory damages in an amount to be determined at trial, statutory damages in the maximum amount authorized by law, plus punitive damages in an amount to be determined at trial appropriate to the severity of the Defendants' conduct and their financial ability to pay, and award Plaintiffs their attorney fees as applicable under the Texas Theft Liability Act;

5.     Award prejudgment interest on each Count to the extent allowed under applicable law or statute;

6.     Award Plaintiffs their reasonable attorney fees and costs to any Count to the extent allowed under applicable law or statute; and

7.     Grant the Plaintiffs such further relief this Court deems just and proper.

Respectfully submitted,

LUTTRELL + CARMODY LAW GROUP
One International Centre
100 N.E. Loop 410, Suite 615
San Antonio, Texas 78216
Tel.   210.426.3600
Fax   210.426.3610
luttrell@lclawgroup.net

By: /s/ Leslie M. Luttrell
   Leslie M. Luttrell
   State Bar No. 12708650

**ATTORNEYS FOR ROBIN AND MARK VERSTUYFT AND GORDON AND WENDY KUENEMANN**

VILLA & WHITE, LLP
One International Centre
100 N.E. Loop 410, Suite 615
San Antonio, Texas 78216
Tel.  210.225.4500
Fax. 210.212.4649
treywhite@villawhite.com

By: /s/ Morris E. "Trey" White III
   Morris E. "Trey" White III
   State Bar No. 24003162

**ATTORNEYS FOR THE BEYER LIVING TRUST**